IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

STEVEN M. MEEHAN,                )
                                 )    Case No. 11-50098
            Plaintiff,           )
                                 )    Hon. P. Michael Mahoney
        v.                       )    U.S. Magistrate Judge
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security, )
                                 )
            Defendant.           )

**MEMORANDUM OPINION AND ORDER**

I.     **Introduction**

    Steven M. Meehan seeks judicial review of the Social Security Administration

Commissioner's decision to deny his claim for Disability Insurance Benefits ("D.I.B.") under

Title II of the Social Security Act. *See* 42 U.S.C. § 405(g). This matter is before the Magistrate

Judge pursuant to the consent of both parties. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

II.    **Administrative Proceedings**

    On May 9, 2008, Meehan applied for D.I.B. alleging his disability onset date as July 9,

2007. (Tr. 110-116.) His application was initially denied on August 27, 2008 and denied a

second time upon reconsideration on October 8, 2008. (Tr. 52-56, 58-62.) He then filed a timely

request for a hearing before an Administrative Law Judge ("A.L.J."). His request was granted

and the hearing took place on June 5, 2009. (Tr. 10.)  Meehan was present in-person

1

with an attorney in Evanston, Illinois before A.L.J. Daniel Dadabo. (Tr. 10.) A vocational expert

("V.E."), James Radky, was present and testified at the hearing. (Tr. 27.) No medical expert was

called to testify. (Tr. 27.)

On October 8, 2009, the A.L.J. issued a written decision finding Meehan "not disabled"

and denying benefits. (Tr. 51.) Meehan requested review of the A.L.J.'s decision and the

Appeals Council denied his request. (Tr. 1-5.) As a result of this denial, the decision of the A.L.J.

is considered the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1455,

416.1481, *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Meehan now files a complaint

in the United States District Court for the Northern District of Illinois, Western Division, seeking

judicial review under 42 U.S.C. §§ 405(g), 1383(c)(3).


## III.   Background and Hearing Testimony

Meehan was born on May 5, 1957, making him fifty-two years old at the time of the

A.L.J. hearing. (Tr. 110.) He graduated from high school, earned a bachelor's degree in

behavioral health science, and was previously employed as a mental health and addiction

counselor, D.U.I. evaluator, therapist, and case manager at various agencies. (Tr. 4, 12-13, 28-

29, 131, 136, 138-150, 160-167.) He was briefly married in 2006 and 2007. (Tr. 205.) Meehan

alleges that he is unable to work due to depression and bipolar disorder. (Tr. 130.)

At the hearing, Meehan admitted that he was currently looking for counseling jobs. (Tr.

4.) But, when questioned by the A.L.J., he stated that he was "not certain" that he was able to

perform that kind of work anymore on account of his depression. (Tr. 4.) On a scale of one-to-

ten,[1] Meehan rated his depression as a "six," as he claimed it gave him difficulties with

---

[1] "['Ten'] basically means they have to hospitalize you," the ALJ explained.

2

concentration, memory, and staying on task. (Tr. 4, 14.) For example, he stated that he had trouble remembering the names of people he had recently met and "recalling the specifics of tasks that need to be done." (Tr. 6.) The claimant also testified that he had been voluntarily hospitalized because of his depression on at least two occasions in 2006 and 2007. (Tr. 22-23.) He reported the hospitalizations involved some suicidal ideation and took place during the same period of his divorce, the death of his brother, and the termination of his job. (Tr. 14.) Depression, he claimed, has affected him for "[m]ost of [his] life, [or] at least [during] the last [ten] years." (Tr. 15.) "It's grown far more severe the last [two-and-a-half] years," he said. (Tr. 16.)

The details of Meehan's history with alcohol abuse were not discussed during the hearing. He testified that he had been abstinent from alcohol for nearly five months prior to the hearing. (Tr. 13.) Yet, he stated that he "binge drinks" a few times a year. (Tr. 13, 19.) Most recently, his binge consisted of drinking three-to-six beers in one day. (Tr. 19.) He believes the purported overindulgence was brought on due to his depression and the fact that his brother was killed in a traffic accident around that time. (Tr. 20.) Meehan denied that his five-month sobriety had any positive effects on his functioning whatsoever. (Tr. 14.)

Meehan's average day consists of him showering and watching television; he often stays at home. (Tr. 14, 27.) When the A.L.J. asked if Meehan had problems getting along with people or "with people in general," he denied any problems - but described himself as "guarded" and "a recluse." (Tr. 16.) He explained that he avoids going out to eat or to the movies because he does not have money to "go out and do things." (Tr. 26.)

He claimed that he was able to clean the floors and do laundry. (Tr. 13.) He lives with a roommate who helps him with household chores and drives him to appointments because

Meehan's driver's license was suspended at the time of the hearing. (Tr. 13, 16.) He goes to church regularly and often takes on work there for extra funds; this includes yard work or vacuuming. (Tr. 17.) He volunteers to lead "Jesus Club," a biblical life-skills program for children at church as well. (Tr. 17.)

During his alleged period of disability he obtained a position as a "D.U.I. risk education" teacher in Oregon, Illinois for the "Accepting Responsibility is Mandatory" ("A.R.M.") Program. (Tr. 18.) The position was short-lived as he was let go after two days on the job; Meehan was unable to secure transportation to Oregon because he did not have a driver's license. (Tr. 18.) When asked how long he might have kept that job if his ability to drive was not in question, he stated that he was "uncertain" as a result of his depression. (Tr. 18.) Aside from the A.R.M. position, he was most recently employed at the Department of Children and Family Services ("D.C.F.S."). (Tr. 23-24, 131.) His job lasted one year, from 2006 to 2007. (Tr. 24.) He claimed that he was terminated for being "unable to produce all the paperwork that was involved." (Tr. 24.) According to Meehan, there were no other jobs that he lost due to his poor performance. (Tr. 24.)

Later during the hearing, the claimant's attorney asked Meehan if the "nature" of past counseling work had an effect on his depression. (Tr. 27.) He answered, "It was a bit depressing[,] [b]ut I was able to cope. I spoke frequently with colleagues and coworkers . . . about what was going on and how I was feeling." (Tr. 27.)

Meehan said that he sees a therapist every other week. (Tr. 14.) He also testified that he sees a psychiatrist at a discounted rate of one dollar per session. (Tr. 11-12, 20-21.) He has been prescribed Lexipro, Ziprexa, Prozac, Ambien, Welbutrin, and Concerta. (Tr. 14, 21-22.) He

testified that counseling and medication have "helped a great deal" to clarify his thinking and identify coping skills. (Tr. 16.) "[W]ithout the medication," he said, "I'd be sunk." (Tr. 25.)

James Radke, a V.E., testified at the hearing after the claimant. (Tr. 27.) The A.L.J. posed a hypothetical describing an individual similar to Meehan's age, education level, and work background, who could perform an unskilled job, requiring less than thirty days of training and not involving public contact or extended communication. (Tr. 29.)  In response, the V.E. identified certain jobs existing in substantial numbers within northern Illinois that the hypothetical person could perform: janitor (36,100 jobs), food preparation worker (8,400 jobs), and hand packer (10,500 jobs). (Tr. 30.)

## IV.    Record Evidence

### A. Medical Records

The first relevant records originate from when Meehan entered Swedish-American Health System in early August 2006. (Tr. 205.) He stated that he was very stressed and had been dealing with depression related to marital problems and his brother's death a few months prior. (Tr. 205.) He was experiencing "a great deal of anxiety, crying spells, sleeplessness[,] and very poor appetite." (Tr. 205.) Bruce Feathers, L.C.P.C., counseled Meehan regarding codependency issues and worked on building self-esteem, self-care, cognitive adjustment, and "promoted healthier

means of coping with emotions." (Tr. 205.) Meehan decided to file for divorce and reported some degree of improvement shortly afterwards. (Tr. 205.) Mr. Feathers recommended that he follow-up with further counseling. (Tr. 205-206.)

Citing the "inability to care for [him]self," the claimant voluntarily checked himself in to Glen Oaks Hospital ("G.O.H.") a year later, on July 18, 2007. (Tr. 225-228.) He was diagnosed with major depressive disorder and alcohol dependence. (Tr. 232.) It was reported that he had been "abusing [six-to-eight] beers daily" and indicated that he had relapsed after twelve years of sobriety. (Tr. 232-233.) Meehan was also experiencing legal trouble at the time. (Tr. 247.) He conveyed that he had recently reunited with his ex-wife and began drinking with her. (Tr. 247.) The reunion culminated in a "pushing match" and Meehan was arrested and charged with domestic battery. (Tr. 247.) "Patient also has two D.U.I. cases pending," Lisa O'Brien, L.P.C. added. (Tr. 247.)

As to the claimant's mental condition at the time of this distress, Ms. O'Brien found that Meehan

> [had] insight to his problems that led him to his admission [to
> G.O.H.]. [He had] an understanding what he needs to do for
> himself[,] . . . [had] been in contact with his sponsor from
> [Alcoholics Anonymous], . . . has stated that he has goals and
> understands that he needs to work on things slowly, . . . . [and]
> states that he hit 'rock bottom' and this was his wake[-]up call.
>
> (Tr. 247.)

He was discharged from G.O.H. the next day, July 19, 2007, and was instructed to follow-up with counseling and therapy at the Ben Gordon Center ("B.G.C."). (Tr. 247.)

Two weeks later, Meehan made an appointment with a psychiatrist, Dr. Marianne Geiger, M.D., at the Clinic of Psychiatric Care concerning his depression. (Tr. 275.) He was then referred to a therapist, Bruce Person, L.C.S.W., on August 14, 2007. (Tr. 273.) During the resulting therapy sessions, he expressed anger that his marriage ended. (Tr. 275.) For much of the year-long marriage he and his wife lived apart, but they planned to relocate "so [Meehan] impulsively quit his job (but wasn't able to keep up with the job's duties anyway)," Person

wrote. (Tr. 273.) "He is still unemployed and actively seeking a Bachelor's degree[-]level social[-]services type position." (Tr. 273.)

On September 5, 2007, Meehan met with Mr. Person and reported that he attempted to reunite with his ex-wife again. (Tr. 271.) She phoned Meehan on August 27 and had moved back into his house within two hours after the call. (Tr. 271.) Spontaneously, they decided to travel to St. Louis, where they began to drink – effectively ending Meehan's period of abstinence. (Tr. 271.) On September 2, 2007, she and Meehan got into an argument while at a bar in Missouri. (Tr. 271.) Meehan was unable to recall any other events before waking up in jail on September 3. (Tr. 271.) Following his release, he discovered that his ex-wife had used his money to relocate to a different motel room. (Tr. 271.) She was not alone within the new room and she refused to return his belongings. (Tr. 271.) He left her in St. Louis and traveled back to Illinois by himself. (Tr. 271.) Not surprisingly, Meehan claimed to be "significantly depressed." (Tr. 271.) Meehan remained sober and attended Alcoholics Anonymous ("A.A.") meetings following the incident. (Tr. 270.) He continued to seek employment and he and Mr. Person agreed to a special payment plan so he could continue counseling. (Tr. 270.)

The counseling and job search continued throughout September. (Tr. 269.) Following a few leads provided by Mr. Person, several job interviews took place. (Tr. 268-268.) It was reported that Meehan obtained a job offer, but it fell through due to his recent D.U.I. and arrest. (Tr. 266-267.) Meehan was discouraged, but continued job hunting. (Tr. 266.) He remained sober for most of the fall, with the exception of drinking a single glass of wine. (Tr. 263.) Mr. Person cautioned him concerning his lack of attendance on November 14, 2007, but continued to

provide Meehan with job opportunities through the rest of the year and into the next. (Tr. 261, 263.) During that time, Sharon Rische, N.P., met with the claimant concerning his medications about once a month. (Tr. 257-280.)

By June 2008, Meehan's job search remained unsuccessful and he was experiencing significant financial hardship; he was two months behind on his mortgage. (Tr. 256.) "No luck finding social services[-]type employment due to his legal [history]," Mr. Person reported on June 5, 2008. (Tr. 256.) "[Meehan] [p]lans to initiate [the] [Social Security Disability ("S.S.D.")] application process now." (Tr. 256.) Mr. Person aided Meehan with his application paperwork, gave him a job lead, and specifically noted that Meehan wanted to find full-time social services-type employment. (Tr. 282.) On June 27, 2008, Ms. Rische noted that Meehan was still depressed and would need to find a job in a "new field" due to his prior arrest. (Tr. 281.)

On August 11, 2008, Meehan underwent a consultative psychological evaluation by Drs. John Peggau and Kelly Renzi, Psy. D. (Tr. 289.) Following interview and examination of the claimant and his history, the doctors diagnosed Meehan with bipolar I disorder, most recent episode depressed, moderate; and Alcohol Dependence in early full remission. (Tr. 291.) Dr. Peggau concluded,

> the claimant displayed no difficulty with understanding directions. His concentration and memory were adequate. His judgment was intact. His social interaction with this examiner was appropriate and he was cooperative with the evaluation. His mood was depressed and his affect was flat. The claimant meets the criteria for Bipolar I Disorder, Most Recent Episode Depressed.

(Tr. 291.)

Later that month, Dr. B. R. Horton, Psy. D., state agency psychologist, completed a Mental Residual Functional Capacity Assessment form after reviewing the record evidence. (Tr. 293.) Using the standard "check-box" format, he found that

8

- Meehan's "Understanding and Memory" was "Not Significantly Limited;"

- "Sustained Concentration and Persistence" was only "Moderately Limited," in the ability to "maintain attention and concentration for extended periods" and the ability to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;"

- "Social Interaction" was not limited; and

- "Adaptation" was not limited.

  (Tr. 293-294.)

In his evaluation summary, Dr. Horton concluded the claimant had mild limitations in "Activities of Daily Living" and "Maintaining Social Functioning," but moderate difficulties in "Maintaining Concentration, Persistence, or Pace." (Tr. 307.) Dr. Horton opined that with continued treatment, Meehan would retain the ability to do competitive work in a forty-hour work week within his physical parameters. (Tr. 295.)

Treating psychologist Dr. Geiger completed a Mental Functional Capacity worksheet on October 13, 2008. (Tr. 215.) She check-marked the following degrees of Meehan's impairments:

- the ability to relate to other people impairments were mild;

- restriction of daily activities was moderate;

- deterioration in personal habits was moderately severe;

- maintaining concentration and attention for extended periods limitations were moderately severe;

- the ability to sustain a routine without supervision limitations were also moderately severe;

- and activities within a schedule, maintaining regular attendance, and punctuality limitations were moderate. (Tr. 215-216.)

Her opinions as to the limitations in the claimant's ability to do the following on a sustained basis in a routine work setting were as follows:

9

- Limitations in ability to understand, carry out and remember instructions and respond to customary work pressures were moderately severe. (Tr. 216.)

- Limitations in the ability to respond appropriately to co-workers were mild; and

- limitations in the ability to respond appropriately to supervision, changes in the work setting, use good judgment, perform simple tasks, perform complex tasks, and behave in an emotionally stable manner were moderate. (Tr. 216.)

In the fall of 2008, Meehan received notice that his S.S.D. claim had been twice denied. (Tr. 316.) On November 11, 2008, Mr. Person helped the claimant procure and fill-out the forms required to request a hearing. (Tr. 315.) Ms. Rische saw Meehan the following day and reported that his depression was "stable" and his sleep was "better." (Tr. 314.)

In December, Mr. Person indicated that Meehan was failing to keep his scheduled appointments. (Tr. 313) "He states [that] his chronic depressive symptoms impact . . . his memory/focus/concentration abilities," Person wrote. (Tr. 313.) It was reported that Meehan did not observe Thanksgiving and now avoided church because his ex-wife now attended there. (Tr. 313.)

On January 15, 2009, Mr. Person wrote a letter to Meehan's attorney: "[Meehan] is being treated for symptoms of Major Depression, recurrent episode, chronic with acute exacerbation." (Tr. 323.) He listed the claimant's medications: Lexapro, Prozac, Wellbutrin, Ritalin, and Zyprexa. (Tr. 323.) "His issues of concern include, but are not limited to: financial stressors; loneliness; struggle with history of addictions; relationship losses; deaths of relatives," he wrote. (Tr. 323.) "I support his application for [S.S.D.] benefits, and appreciate the legal assistance you are providing to help him." (Tr. 323.)

There are typed reports from "Geiger Psychiatric Care" that provide short notes detailing Meehan's office visits from February to May 2009. (Tr. 325-331.) The court highlights several reports from those sessions:

February 6, 2009:

- "Chief Complaint: Depressed."

- The claimant "is relying more on his spiritual beliefs to keep him sober, rather than [A.A.] involvement."

- Diagnosis: "Bipolar 1 Mixed," Anxiety, Major Depressive Disorder, Alcohol Dependence"

(Tr. 330.)

February 20, 2009:

- Meehan "is financially struggling to maintain home ownership."

- "Depressed" and "Feelings of worthlessness/guilt"

- "Fatigue /loss of energy nearly everyday"

- "searching for work"

- Diagnosis: "MDD – Recurrent, Mod 296.32"

(Tr. 330.)

March 23, 2009:

- "Chief Complaint: In financial distress. . . ."

- "Applying for employment, but no luck."

- "Sleep problems."

- "Remains sober."

- Diagnosis: Anxiety, Major Depressive Disorder, Alcohol Dependence

(Tr. 328.)

11

April 2, 2009:

- "Very depressed and financially hurting."

- "No luck finding employment."

- "Needs to go to Public Aid office to stir-up application for benefits."

(Tr. 327.)

May 12, 2009:

- Meehan reported that he had problems sleeping, but "Ambien CR 12.5 helps" him to fall asleep.

- He tried to sell plasma for money, but was turned away due to high blood pressure.

- Meehan obtained a roommate, a man that he met in A.A., who helped him with living expenses.

(Tr. 326.)

May 27, 2009:

- Meehan's sleep was impaired.

- "Chief complaint: Depressed"

- "Has . . . craving to drink alcohol, but has resisted."

- The claimant says "what he really needs is employment to focus upon."



- "We did some internet research together and came up with a minimum of three jobs he is qualified to apply. . . ," Mr. Person wrote. Meehan planned to fax those applications out later that day

- Diagnosis: Alcohol Dependence and Major Depressive Disorder

(Tr. 325.)

At each of these meetings, Mr. Person recorded Meehan's demeanor. (Tr. 325-331.) It did

not vary during the preceding four months:

> General interaction: relaxed, casual, cooperative, appropriate.
> Oriented to person, place, and time. Affect mood congruent. Mood
> is euthymic. Speech: coherent, normal rate, normal tone, well
> modulated.  Thoughts are normal in quantity, rate, and content.
> Reliability: good. No evidence of suicidal or homicidal thought,
> plan intent, or action. No self mutilation. Impulsivity: within
> societal norms. Judgment: intact. Hallucinations: absent.
> Delusions: absent. Insight into illness: good. Insight into need for
> treatment: good.

(Tr. 325-331.)

## V.       Standard of Review

The court may affirm, modify, or reverse the A.L.J.=s decision outright, or remand the

proceeding for rehearing or hearing of additional evidence. 42 U.S.C. ' 405(g). The A.L.J.=s

legal conclusions are reviewed *de novo*. *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997).

However, the court Amay not decide the facts anew, reweigh the evidence or substitute its own

judgment for that of the [A.L.J.].@ *Id.* The duties to weigh the evidence, resolve material

conflicts, make independent findings of fact, and decide the case are entrusted to the

Commissioner. *Schoenfeld v. Apfel,* 237 F.3d 788, 793 (7th Cir. 2001) (AWhere conflicting

evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the

responsibility for that decision falls on the Commissioner.@)

If the Commissioner=s decision is supported by substantial evidence, it is conclusive and

this court must affirm. 42 U.S.C ' 405(g); *see also Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir.

2002). ASubstantial evidence@ is Aevidence which a reasonable mind would accept as adequate

to support a conclusion.@ *Binion,* 108 F.3d at 782. If the A.L.J. identifies supporting evidence in

the record and builds a Alogical bridge@ from that evidence to the conclusion, the A.L.J.=s

13

findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the A.L.J.=s decision Alacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded.@ *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI.   <u>Framework of Decision</u>

ADisabled@ is defined as the inability Ato engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.@ 42 U.S.C. ' 423(d)(1)(A). A physical or mental impairment is one Athat results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.@ 42 U.S.C ' 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. ' 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity, (2) whether the claimant suffers from a severe impairment, (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner=s Listing of Impairments, (4) whether the claimant is capable of performing work which the claimant performed in the past, and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant=s residual functional capacity (AR.F.C.@) and vocational factors. *See* 20 C.F.R. ' 404.1520.

## VII.   <u>Analysis</u>

14

**A.      Step One: Whether the Claimant is Currently Engaged in Substantial Gainful Activity.**

In the Step-One analysis, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties and is done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If Claimant is engaged in substantial gainful activity, he or she is found "not disabled" regardless of medical condition, age, education, or work experience, and the inquiry ends. If Claimant is not engaged in substantial gainful activity, the inquiry proceeds to Step Two.

Here, the A.L.J. found that Claimant has not engaged in substantial gainful activity since July 9, 2007. (Tr. 43.) Neither party disputes this decision. As such, this court affirms the A.L.J.'s Step-One determination and moves to Step Two.

**B.      Step Two: Claimant Suffers From Severe Impairments.**

Step Two requires a determination whether the claimant is suffering from a severe impairment. A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step-Two severity determination.

20 C.F.R. § 404.1520(c). If the claimant suffers a severe impairment, then the inquiry moves on to Step Three. If the claimant does not suffer a severe impairment, then the claimant is found "not disabled" and the inquiry ends.

In performing the Step-Two analysis in this case, the A.L.J. found that the claimant had the following severe impairments: "recurrent major depression; bipolar disorder I, most recent

15

episode depressed, moderate; and alcohol dependence." (Tr. 14.) The substantial evidence in the record supports the conclusion that Claimant suffered the severe impairments. Neither party disputes this decision. As such, this court affirms the A.L.J.'s Step-Two determination.

> **C.** **Step Three: Claimant's impairment does not meet or medically equal an impairment in the Commissioner's listing of impairments.**

At Step Three, a claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1. (the "Listings"). The Listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from adequately performing any significant gainful activity. 20 C.F.R. §§ 404.1525(a); 416.925(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *See Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled, and the inquiry ends. If not, the inquiry moves on to Step Four.

However, a claimant is not entitled to benefits if drug abuse or alcoholism is material to a finding of disability. *See* 42 U.S.C. 423(d)(2)(C). Drug or alcohol addiction is a contributing factor material to a finding of disability if a claimant would no longer be disabled if he stopped using drugs or alcohol. 20 C.F.R. 404.1535(b)(2). If a claimant's remaining limitations would not be disabling absent the use of drugs or alcohol, the Commissioner will find that substance addiction is a contributing factor material to the determination of disability. 20 C.F.R. 404.1535(b)(2)(i).

In the Step-Three analysis in this case, the A.L.J. first determined that "including the substance abuse disorder, [the claimant] meet[s] sections 12.04 and 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d))." (Tr. 43.) Listing 12.04 states that a claimant

16

meets the required level of severity for affective disorder when the requirements in both

paragraphs A and B are satisfied, or when the requirements in paragraph C alone are satisfied.

*See* 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.04. Here, the A.L.J. focused on the conditions of

paragraphs A and B of the listing 12.04 when making this determination. (Tr. 43-45.)

To meet the requirements of paragraph A, the claimant must have medically documented

persistence of (1) depressive, (2) manic, or (3) bipolar syndromes. *See* 20 C.F.R. Pt. 404, Subpart

P., App. 1, § 12.04. As the A.L.J. appropriately found here, where a claimant has a medically

documented persistence of a depressive syndrome, it must be characterized by at least four of the

following symptoms:

> [a.] Anhedonia or pervasive loss of interest in almost all activites;

> [b.] Appetite disturbance with change in weight;

> [c.] Sleep disturbance;

> [d.] Psychomotor agitation or retardation;

> [e.] Decreased energy;

> [f.] Feelings of guilt or worthlessness;

> [g.] Difficulty concentrating or thinking;

> [h.] Thoughts of suicide; or

> [i.] Hallucinations, delusions, or paranoid thinking.

> *Id.*

The A.L.J. does not discuss these factors. He only provides that the claimant's depressive

syndrome is "aggravated by alcohol use." (Tr. 43.) Not only is this "aggravation" absent from

the list of factors that "must" characterize a claimant's depressive disorder, it is but a solitary

17

factor; *at least* "four" factors are required by the listing 12.04. *See* 20 C.F.R. Pt. 404, Subpart P.,

App. 1, § 12.04. This leaves the court guessing as to what requirements the A.L.J. has

determined the claimant has met. Therefore, the court cannot find a logical bridge in this part of

the A.L.J.'s opinion.

Besides meeting paragraph A's requirements, a claimant must also satisfy the criteria of

12.04's paragraph B. *See* 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.04. Paragraph B states that

a claimant's impairment must result in at least two of the following: (1) a marked restriction of

activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked

difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of

decompensation, each of extended duration. *See Id.*

The A.L.J. concluded that Meehan had marked difficulties in social functioning and

concentration, persistence, and pace "when abusing alcohol." (Tr. 43.) He found only mild

restrictions in activities of daily living and the claimant did not have the prerequisite periods of

decompensation. (Tr. 43.)

In finding marked difficulties in social functioning, the ALJ wrote, "When abusing

alcohol, the claimant has exhibited restricted capabilities for appropriate interaction." (Tr. 43.)

He supported his position: "In July 2007, major depression in combination with alcohol relapse

led to physical altercation which required police intervention." (Tr. 43.)

The A.L.J. also found marked difficulties in "concentration, persistence, or pace." (Tr.

43.) He offered in support, "[Meehan] has significant problems concentrating when abusing

alcohol, and would have difficulty with persistence, poor judgment[,] and work attendance." (Tr. 43.)

Next, the A.L.J. found that if the claimant "stopped the substance use, the remaining limitations would not meet or medically equal the criteria of listing 12.04." (Tr. 44.) Here, the A.L.J. focused on the conditions of paragraph B of the listing 12.04 when making this determination, conceding that the other requirements have been met as in his initial Step-Three finding. (Tr. 43-45.) The A.L.J. analyzed the claimant's impairment in each category of paragraph B. *See supra* at p. 18, (Tr. 44.)

In terms of "daily living," the A.L.J. found that Meehan had mild restrictions, as he is "generally . . . able to attend to his personal needs, even when abusing alcohol," although "he sometimes lacks energy and motivation." (Tr. 43, 45.)

Second, in the category of "social functioning," the A.L.J. concluded that "the claimant would have moderate difficulties if the substance use was stopped. The claimant prefers to isolate depending on his mood and can be somewhat irritable, but he is able to maintain friendships, attend meetings, volunteer at church and participate in choir." (Tr. 44.)

Third, the A.L.J. also found "moderate difficulties" in "concentration, persistence, or pace" if substance use stopped. "The claimant's functioning was well-preserved on cumulative examination[s], and his treatment notes during periods of sobriety are not descriptive significant limitations," the A.L.J. reasoned. (Tr. 44.) He continued, "Depressive symptoms may cause some

difficulty with overly complex or detailed tasks, but generally the evidence is consistent with a finding that the claimant would be able to concentrate on and persist at simple tasks, as well as perform them at a reasonable pace." (Tr. 44.)

Lastly, the A.L.J. found that "the claimant would experience one to two episodes of decompensation if the substance use was stopped." (Tr. 44.) The A.L.J. noted that any episodes of decompensation were not of "extended duration" as required by the listings. *See* 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.00.

In finding that alcohol use is material to the claimant meeting a listing, the ALJ must consider the period when the claimant was not using alcohol and how any mental impairment improved during that period of abstinence. *Wright v. Astrue*, 211 WL 1486208 at *9 (7th Cir. 2011). Therefore,

> where the record is devoid of any medical or psychological report, opinion, or projection as to the claimant's remaining limitations if [he] stopped using . . . alcohol, an A.L.J. should "find that [alcohol abuse] is not a contributing factor material to the determination of disability."

*Id.* (quoting *Salazar v. Barnhart*, 468 F.3d 615, 624 (10th Cir. 2006.))

As summarized in the preceding paragraphs, the A.L.J. appears to provide some degree of medical or psychological support in his Step-Three determination – specifically regarding his finding of moderate difficulties in concentration, persistence, and pace. *See supra* at p. 17, (Tr. 44.) However, most of the support that the A.L.J. provides throughout Step Three is based on conclusory statements concerning the claimant's condition. There is very little evidence cited from the transcript record. This is not to say that the A.L.J.'s *conclusions* are correct or incorrect. But again, this court is left guessing as to how exactly the A.L.J. reached these conclusions.

The court cannot find a logical bridge supported by substantial evidence within the record as to how the A.L.J. reached these Step-Three conclusions. The case is therefore remanded back to the A.L.J. for further proceedings to address these issues at Step Three. For the sake of completeness, the court will move on to analyze Steps Four and Five as if Step Three were affirmed.

      **D.**      **Step Four: Whether the Claimant is not capable of performing work which Claimant has performed in the past.**

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("R.F.C.") allows the claimant to return to past relevant work. RFC is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a), 416.945(a). The R.F.C. assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about his or her limitations. *Id*. Although medical opinions bear strongly upon the determination of the RFC, they are not conclusive. The determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

Past relevant work is such work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565(a), 416.965(a); Social Security Ruling 82-62. If the claimant's R.F.C. allows the claimant to return to past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

The A.L.J. determined Claimant's R.F.C. as follows:

21

> If the claimant stopped the substance use, [he] would have the
> [R.F.C.] to perform a full range of work at all exertional levels . . .
> with the following non[-]exertional limitations[:] the need for
> unskilled work that is learnable in [thirty] days or less, which does
> not involve public contact or extended communication.

(Tr. 45.)

In reaching this R.F.C., the A.L.J. found that the assessment prepared by Drs. Renzi and

Paggau "merit[ed] substantial weight" and he assigned "minimal weight" to Meehan's treating

physician, Dr. Geiger's opinion that the claimant was disabled and unable to work.  The claimant

objects to the A.L.J.'s determination and his statement that Dr. Geiger "does not appear to

possess specific longitudinal familiarity with this claimant's functioning." (Tr. 48.)

Generally, an A.L.J. will give more weight to the opinion of treating sources because of

the likelihood that those sources are most likely to provide a "detailed, longitudinal picture of [a

claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence

that cannot be obtained from the objective medical findings" or from consultative examinations.

*See* 20 C.F.R. § 404.1527(d)(2); SSR 96-2p.  But, "[c]ontrolling weight may be given only in

appropriate circumstances to medical opinions . . . on the [issues] of the nature and severity of an

individual's [impairments] from treating sources."  S.S.R. 96-2p ¶ 2.  "Controlling weight may

not be given to a treating source's medical opinion unless the opinion is well-supported by

medically acceptable clinical and laboratory diagnostic techniques." *Id.* at ¶ 3-4. "Even if a

treating source's medical opinion is well-supported, controlling weight may not be given to the

opinion unless it also is 'not inconsistent' with the other substantial evidence in the case record."

*Id.* The A.L.J. must review all of the medical findings and other evidence that might support a

medical source's statement that a claimant is disabled, but "[a] statement by a medical source

22

that [a claimant is] 'disabled' or 'unable to work' does not mean that [the A.L.J.] will determine

that you are disabled." 20 C.F.R. 404.1527(d)(2). Indeed,

> [t]he treating physician's opinion is important because that doctor
> has been able to observe the claimant over an extended period of
> time, but it may also be unreliable if the doctor is sympathetic with
> the patient and thus 'too quickly find[s] disability.' . . .
> Accordingly, if the treating physician's opinion is inconsistent with
> the consulting physician's opinion, internally inconsistent, or based
> solely on the patient's subjective complaints, the [A.L.J.] may
> discount it.
>
> *Ketelboeter v. Astrue,* 550 F.3d 620, 625 (7th Cir. 2008). (citations
> omitted.)

Nevertheless, in all circumstances, the ALJ should give good reasons for the weight assigned to

a treating physician. *See* 20 C.F.R. § 404.1527(d)(2).

The A.L.J. found that Dr. Geiger's opinion[2] was not supported by other medical

evidence in the record. (Tr. 48-49.) He noted the lack of treatment notes composed by Dr.

Geiger, and that it appeared as though Mr. Person was responsible for most of the information

originating from Dr. Geiger's clinic. (Tr. 48.) "The entire treatment chart was prepared by

therapist Bruce [Person] and the claimant averred at hearing that Dr. Geiger sees him at a

discount rate." (Tr. 48.)

Furthermore, "the actual chart notes of evaluation and [Dr. Geiger's] assessment are

materially inapposite," the A.L.J. stated. (Tr. 48.) "For example, on May 27, 2009, when the

claimant was 'very depressed,' [Mr. Person,] helped the claimant . . . to come up with a

minimum of three jobs. . . . The claimant stated at the time that what he really needed was

employment." (Tr. 48.) "He also had been searching for work as of February 20, 2009, at which

---

[2] *See supra* at p. 9, (Tr. 215.)

point [Mr. Person] regarded major recurrent depression as merely 'moderate,' rather than 'severe.'" *See supra* at p. 11, (Tr. 48.)

In a functional assessment on October 13, 2008, Dr. Geiger noted that the claimant was unable to work and would experience "'moderately severe' difficulty responding to customary work pressures, understanding, carrying out and remembering instructions, and sustaining a routine without special supervision." (Tr. 48.)

On the other hand, the A.L.J. stated that "Dr. Renzi clinically observed that the claimant demonstrated no difficulty understanding directions, was appropriate and cooperative, and exhibited alert sensorium." (Tr. 48.) "She rated his DSM-IV GAF score as 65, signifying merely moderate functional impact." (Tr. 48.) The A.L.J. found that Dr. Peggau and Dr. Renzi's evaluation "is entirely consistent with the opinion implied by [Mr. Person], in that he seems to perceive ongoing demonstration of work capacities for some job, not necessarily work in the claimant's [prior] field." (Tr. 49.) The court finds that the A.L.J.'s R.F.C. determination is supported by the following specific evidence as well:

- Claimant's testimony asserting depression, social withdrawal, low energy, loss of focus, and impaired concentration. . . ." (Tr. 46.)

- Claimant continuously searched for work during his alleged period of eligibility. When he was hired for a new counseling position in October of 2007, he was let go due to his criminal record. (Tr. 46.)

- Therapist, Mr. Person, did not discourage Claimant from seeking employment and aided him in his job search. (Tr. 46.)

- "The work that he actively searched for was *skilled*, allowing the inference that he regarded himself as . . . capable of unskilled tasks that could be learned on short demonstration. . . ." (Tr. 46.)

- Claimant worked voluntarily for his church. (Tr. 47.)

Next, the A.L.J. found that Meehan would be unable to perform any of his past relevant work. Noting the claimant's past relevant work as a case manager, the A.L.J. determined that

"the claimant's above[-]described [R.F.C.], even in absence of alcohol use, limits him to unskilled work." Neither party disputes this finding. As such, this court affirms the A.L.J.'s Step-Four determination and the analysis moves to Step Five.

> **E.** **Step Five: Whether the Claimant is capable of performing work existing in substantial numbers in the national economy.**

At Step Five, the Commissioner must establish that a claimant's R.F.C. allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. § 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon a V.E.'s testimony, or by showing that the claimant's R.F.C., age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "Grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the Commissioner establishes that sufficient work exists in the national economy that a claimant is qualified and able to perform, then Claimant will be found "not disabled." If no such work exists, the claimant will be found to be disabled.

At the hearing, the V.E. identified certain jobs existing in substantial numbers within northern Illinois that the hypothetical person could perform: janitor (36,100 jobs), food preparation worker (8,400 jobs), and hand packer (10,500 jobs). *See supra* at p. 5, (Tr. 30.) Based on that identification, the A.L.J. determined that the claimant, "if he stopped the substance use, would be capable of making a successful adjustment to work that exists in significant numbers in the national economy." (Tr. 50.)

The claimant complains that the "A.L.J. failed to inquire of the [V.E.] the effect of the 'moderately severe' limitations" in the areas described by Dr. Geiger. But, as stated earlier in this opinion, the A.L.J. did not give Dr. Geiger's findings controlling weight. (Tr. 48-49.) The claimant has not provided the court with any supporting case law and claimant's attorney did not question the V.E. about such limitations although he had the opportunity at hearing. The court does not find the claimant's argument availing. The court finds that the A.L.J.'s Step-Five determination is supported by substantial evidence.

## VIII.    Conclusion

The claimant's motion for summary judgment is granted in part and the Commissioner's motion for summary judgment is denied.  This case is remanded as to the Commissioner's Step-Three determinations. The court instructs the A.L.J. to conduct further administrative proceedings in accordance with this opinion.

ENTER:

_____

**P. Michael Mahoney, Magistrate Judge**
**United States District Court**

**DATE: July 31, 2013**

26